UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
JEFFERSON RODRIGUEZ, FILIBERTO LUCENA,
DAVID PEREZ, LUIS FELICIANO, JEFFREY
RIVERA, ANTONIO NIEVES, JOSEPH APARICIO,
CARLOS VAZQUEZ, and other Hispanics who
are similarly situated,

              Plaintiffs,

    -against-

CITY OF NEW YORK, MARTHA E. STARK,
Commissioner of City of New York
Department Of Finance, LINDSAY EASON,
Sheriff of City Of New York, OSCAR
ODOM III, First Deputy Sheriff
Commissioner, TIMOTHY LAROSE, Chief
Of Operations Sheriff's Office,
THOMAS SCALI, Lieutenant, and NANCY
GOODMAN, Finance Department Advocate,

              Defendants.
----------------------------------------X

**AMENDED COMPLAINT
WITH JURY DEMAND**

06 CV 1555
(RJH)

RECEIVED
JUL 12 2006
U.S.D.C. S.D.N.Y.
CASHIERS

      Plaintiffs, JEFFERSON RODRIGUEZ ("RODRIGUEZ"), FILIBERTO LUCENA ("LUCENA"), DAVID PEREZ ("PEREZ"), LUIS FELICIANO ("FELICIANO"), JEFFREY RIVERA ("RIVERA"), ANTONIO NIEVES ("NIEVES"), JOSEPH APARICIO ("APARICIO"), and CARLOS VAZQUEZ ("VAZQUEZ"), by and through their attorneys, the law firm of CRONIN & BYCZEK, LLP, as and for their Complaint against Defendants, respectfully set forth the following:

## NATURE OF ACTION

      1. This action is hereby commenced for the purpose of seeking to secure protection of, and to redress the

deprivation of, rights secured by the United States Constitution, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, New York State Executive Law § 296, and New York City Human Rights Law § 8-107 et. seq., providing for relief based upon Defendants' unlawful employment practices of engaging in discrimination based upon Plaintiffs' race and retaliation against Plaintiffs for engaging in the protected activity of formally complaining of said discrimination.

## JURISDICTION

2.   The jurisdiction of this Court is invoked based upon federal questions and pursuant to the Constitution of the United States, the New York State Constitution, 28 U.S.C. §§ 1343(3) and (4), 28 U.S.C. § 1331, as well as 42 U.S.C. § 2000e through § 2000e (15).

3.   This Court has supplemental jurisdiction over the federal claims pursuant to 28 U.S.C. § 1367.

4.   Jurisdiction is also invoked under the doctrine of pendant jurisdiction with respect to any and all state claims set forth in all counts.

5.   The rights, privileges and immunities sought herein to be redressed are those secured by the First Amendment freedom of speech and by the equal protection and

due process clauses of the Fourteenth Amendment of the United States Constitution, and provisions against race discrimination and retaliation in employment based upon Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, along with applicable provisions of the New York State Constitution, New York State Executive Law and New York City Human Rights Law.

## SATISFACTION OF PREREQUISITES UNDER TITLE VII

6. On or about July 20, 2005, Plaintiffs, RODRIGUEZ, LUCENA, PEREZ, FELICIANO, RIVERA, NIEVES and APARICIO, in accordance with applicable law, each filed a Verified Complaint with the United States Equal Employment Opportunity Commission ("EEOC"), which organization receives and investigates charges of discrimination as set forth by the Federal Anti-Discrimination Laws, including Title VII of the Civil Rights Act, as amended. On or about June 7, 2006, Plaintiff Carlos Vazquez, in accordance with applicable law, filed a Verified Complaint with the EEOC.

7. Said Verified Complaints charged that Defendants engaged in unlawful employment discrimination practices based upon race and in retaliation for engaging in protected activity.

3

8.    On November 16, 2005, the EEOC issued "Right to Sue" Letters advising Plaintiffs, except VAZQUEZ, of the completion of their prerequisites to file suit in federal court. Plaintiffs, except VAZQUEZ, received said "Right to Sue" Letters on November 30, 2005. A copy of the "Right to Sue" Letter issued to Plaintiff RODRIGUEZ is annexed hereto as **Exhibit "A"**. A copy of the "Right to Sue" Letter issued to Plaintiff LUCENA is annexed hereto as **Exhibit "B"**. A copy of the "Right to Sue" Letter issued to Plaintiff PEREZ is annexed hereto as **Exhibit "C"**. A copy of the "Right to Sue" Letter issued to Plaintiff FELICIANO is annexed hereto as **Exhibit "D"**. A copy of the "Right to Sue" Letter issued to Plaintiff RIVERA is annexed hereto as **Exhibit "E"**. A copy of the "Right to Sue" Letter issued to Plaintiff NIEVES is annexed hereto as **Exhibit "F"**. A copy of the "Right to Sue" Letter issued to Plaintiff APARICIO is annexed hereto as **Exhibit "G"**. It is anticipated that a "Right to Sue" Letter will be issued to Plaintiff VAZQUEZ on or before December 4, 2006.

**VENUE**

9.    Venue is proper within the Southern District of this Court, County of New York, State of New York, as the course of Defendants' conduct took place within the boundaries of the County of New York, State of New York,

4

and the instant causes of action are based upon violations of the New York State Constitution, New York State Executive Law and New York City Human Rights Law.

## PARTIES

10. Plaintiff RODRIGUEZ is a Hispanic male citizen of the United States and a resident of Queens County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff RODRIGUEZ was, and still is, a uniformed member of the CITY Sheriff's Office since November 1993. He currently holds the position of Sergeant.

11. Plaintiff LUCENA is a Hispanic male citizen of the United States and a resident of Bronx County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff LUCENA was, and still is, a uniformed member of the CITY Sheriff's Office since July 1993.

12.   Plaintiff PEREZ is a Hispanic male citizen of the United States and a resident of Bronx County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff PEREZ was, and still is, a uniformed member of the CITY Sheriff's Office since 1986.

13.   Plaintiff FELICIANO is a Hispanic male citizen of the United States and a resident of Bronx County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff FELICIANO was, and still is, a uniformed member of the CITY Sheriff's Office since 1993. He currently holds the rank of Lieutenant.

14.   Plaintiff RIVERA is a Hispanic male citizen of the United States and a resident of Richmond County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff RIVERA was, and still is, a uniformed member of the CITY Sheriff's Office since 1990. He is currently a Supervising Deputy Sheriff.

6

15.  Plaintiff NIEVES is a Hispanic male citizen of the United States and a resident of Bronx County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff NIEVES was, and still is, a uniformed member of the CITY Sheriff's Office since December 1993.

16.  Plaintiff APARICIO is a Hispanic male citizen of the United States and a resident of Bronx County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff APARICIO was, and still is, a uniformed member of the CITY Sheriff's Office since July 1991. He currently holds the rank of Sergeant.

17.  Plaintiff VAZQUEZ is a Hispanic male citizen of the United States and a resident of Bronx County, State of New York. He has registered his opposition to the discriminatory practices of Defendants and thus is a member of a protected class. At all times relevant to this action, Plaintiff VAZQUEZ was, and still is, a uniformed member of the CITY Sheriff's Office since December 1994.

18.  Defendant CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of

the CITY and State of New York. CITY is authorized by law to maintain a Department of Finance that acts as its agent and for which it is ultimately responsible. The New York City Sheriff's Office is a division of the Department of Finance, and is the chief civil law enforcement office for the CITY.

19. Defendant MARTHA E. STARK ("STARK") has been Commissioner of the CITY Department of Finance since February 2002 and was, and still is, acting in such capacity at all times relevant herein. STARK was, and still is, Plaintiffs' supervisor. STARK is sued in her official capacity.

20. Defendant LINDSAY EASON ("EASON") has been Sheriff for the CITY since January 2002. EASON, at all times relevant to this Complaint, was and still is Plaintiffs' superior officer and supervisor. He is sued in his individual and official capacity.

21. Defendant OSCAR ODOM III ("ODOM") was at all times relevant the First Deputy Sheriff Commissioner in the CITY Department of Finance Sheriff's Office. At all times relevant to this Complaint, ODOM was, and still is, Plaintiffs' superior officer and supervisor. He is sued in his individual and official capacity.

8

22. Defendant TIMOTHY LAROSE ("LAROSE") was at all times relevant the Chief of Operations for the CITY Sheriff's Office. At all times relevant to this Complaint, LAROSE was and still is Plaintiffs' superior officer and supervisor. He is sued in his individual and official capacity.

23. Defendant THOMAS SCALI ("SCALI") was at all times relevant a Lieutenant in the CITY Sheriff's Office. At all times relevant to this Complaint he was and still is Plaintiffs' superior officer and supervisor. He is sued in his individual and official capacity.

24. Defendant NANCY GOODMAN ("GOODMAN") was at all times relevant the CITY Finance Department Advocate, responsible for investigating the conduct of Deputy Sheriffs. She is sued in her individual and official capacity.

## FACTS UNDERLYING PLAINTIFFS' CLAIMS

### A.    COMPLAINT OF JEFFERSON RODRIGUEZ

25. Plaintiff RODRIGUEZ is currently employed as a Sergeant Deputy Sheriff in the CITY Sheriff's Office, a division of the Department of Finance, where he has worked since November 29, 1993.

26. Until he exercised his First Amendment right to complain about the discriminatory treatment he was

9

subjected to in his employment with Defendant CITY, RODRIGUEZ always received excellent performance evaluations and never had any disciplinary problems.

27.  Throughout his tenure with the Sheriff's Office, RODRIGUEZ has submitted at least a dozen requests to be transferred, but like other Hispanic males, Defendants have summarily denied all of his requests.

28.  Meanwhile, the transfer requests of similarly situated non-Hispanic Deputy Sheriffs are routinely granted by Defendants without hesitation.

29.  Specifically, in August 2004, Plaintiff RODRIGUEZ along with several non-Hispanic deputies each made requests to be transferred. Each and every request was approved and granted by Defendants with the sole exception of the request of RODRIGUEZ, the only Hispanic male who sought a transfer, despite the fact that RODRIGUEZ submitted the same requisite documents as said non-Hispanics.

30.  Despite RODRIGUEZ' request, Defendants never provided an explanation for their denial of his request to transfer.

31.  Also in August 2004, Plaintiff RODRIGUEZ submitted another application to be transferred back into the Warrant Unit where he had previously served. Defendants

denied said transfer request, stating that there was "no opening."

32. At the time of RODRIGUEZ' application to transfer into the Warrant Unit, there was in fact an opening available.

33. Shortly thereafter, Defendant ODOM, who is African-American, approved the transfer of a black Sergeant who was recently demoted from Lieutenant to Sergeant, to the Warrant Unit.

34. On or about September or October 2004, Plaintiff RODRIGUEZ requested a change of tour to a four-day workweek so that he could attend classes to further his education and complete a course to obtain a teacher's license with the New York City Department of Education.

35. Defendant ODOM denied said request made by RODRIGUEZ, stating that the Sheriff's Office does not allow for "special tours."

36. Despite Defendant ODOM's claim that the Sheriff's Office does not permit the creation of "special tours" to accommodate a Deputy, Defendants have in the past created "special tours" for non-Hispanic Deputies and continue to do so to the present day.

37. Defendants denial of Plaintiff RODRIGUEZ' request for transfer for failure to submit proper paperwork is

pretextual, since similarly situated non-Hispanic deputies are routinely granted transfer requests despite the absence of any formal paperwork. In fact, many requests are made and granted over the telephone for non-Hispanic deputies.

38. At some point in early 2005, Plaintiff RODRIGUEZ began to be supervised by Defendant SCALI.

39. Defendant SCALI, on his own, and at the direction of the other Defendants, continued to discriminate and retaliate against Plaintiff RODRIGUEZ as a result of his Hispanic background and complaints regarding discrimination based upon his ethnicity.

40. As part of the aforementioned discrimination and retaliation, Defendant SCALI: (a) ordered RODRIGUEZ out of his cubicle and to take up a desk in the Lieutenant's office so that Plaintiff could be monitored (no other Sergeant is forced to work in this fashion), which was done in full view of the other Deputy Sheriffs causing extreme embarrassment and humiliation to RODRIGUEZ; (b) against CITY rules and procedures, Plaintiff RODRIGUEZ was ordered to write all of the reports and affidavits for the non-Hispanic Deputy Sheriffs, including statements involving the non-Hispanic Deputy Sheriffs' actions which they took, and the non-Hispanic Deputy Sheriffs were only required to sign off on the paperwork that Plaintiff RODRIGUEZ created;

and (c) Defendant SCALI allows other non-Hispanic deputies to refuse to work with Plaintiff RODRIGUEZ because of his ethnic background (Hispanic), which results in Plaintiff RODRIGUEZ having to handle dangerous and/or high-profile arrests without adequate backup.

41. As a result of the discriminatory and retaliatory actions of Defendants, Plaintiff RODRIGUEZ attempted, on numerous occasions, to contact Defendant ODOM in order to discuss the hostile work environment in the Sheriff's Office.

42. Defendant ODOM refuses to speak with Plaintiff RODRIGUEZ regarding the discriminatory and retaliatory treatment he is forced to endure. Plaintiff RODRIGUEZ was informed by one of his supervisors, Chief Steve Adams, that he was ordered to inform RODRIGUEZ not to contact Defendant ODOM in regards to his complaints about discrimination and retaliation within the workplace, despite the fact that ODOM was, and still is, First Deputy Sheriff Commissioner.

43. Despite RODRIGUEZ being ordered not to communicate with Defendant ODOM, Defendant ODOM continues to meet on a daily basis with similarly situated non-Hispanic deputies.

44. On or about August 2005, Plaintiff RODRIGUEZ, while in his current unit, the Queens Private Sector,

reported to his supervisors that other deputies were "stealing time" from the Sheriff's Office. As a result of said whistle blowing, RODRIGUEZ was threatened with bodily harm by non-Hispanic deputies, which precipitated RODRIGUEZ' request for a transfer.

45.   Chief Steve Adams informed Defendant ODOM that he feared for RODRIGUEZ' safety and a transfer should be granted in order to avoid harm to RODRIGUEZ. Despite the Chief's stated belief, Defendant ODOM refused to transfer RODRIGUEZ.

46.   As a result of RODRIGUEZ' aforementioned complaints, Defendants have begun to harass and retaliate against RODRIGUEZ by falsely accusing him of frivolous and unsubstantiated claims of misconduct.

47.   In further retaliation against Plaintiff RODRIGUEZ, Defendant GOODMAN continuously threatens Plaintiff with disciplinary action and wrongly accuses him of: (a) cursing on his cell phone, (b) tearing memos off the wall, and (c) double dipping and illegally holding a second job.

48.   In June 2005, Plaintiff suffered a nervous breakdown as a result of Defendants' aforementioned discrimination and retaliation, for which he was hospitalized for approximately one week. As a result,

14

Plaintiff was placed on medication and has seen a psychiatrist at least twice a month.

49. On July 18, 2005, Plaintiff filed a formal complaint with the United States EEOC, pertaining to the aforementioned discrimination and retaliation.

50. Plaintiff thereafter requested a transfer, however, as a condition to said transfer, Defendants told RODRIGUEZ that he had to admit that he was not transferring based upon the discriminatory and retaliatory treatment of Defendants, and must "sign off" on said transfer.

51. Despite said transfer, RODRIGUEZ continues to suffer retaliation, harassment and hostile working conditions as a result of his Hispanic background, and due to the formal complaint he filed with the EEOC as well as the numerous other internal complaints RODRIGUEZ made within the Department of Finance.

52. As a direct result of the severe and pervasive discrimination that Plaintiff RODRIGUEZ has endured in the Sheriff's Office, his earning potential has been severely limited.

53. RODRIGUEZ has suffered severe emotional and psychological damages as a result of the discriminatory, retaliatory and hostile work environment that he was forced to endure and continues to endure to the present day.

**B.    COMPLAINT OF FILIBERTO LUCENA**

54.  Plaintiff LUCENA began his career in the CITY Department of Finance on July 19, 1993. He is currently a Deputy Sheriff in the CITY Sheriff's Office.

55.  Plaintiff LUCENA has accumulated an enormous amount of experience throughout his years with the Sheriff's Department, and has received very good performance evaluations.

56.  Plaintiff LUCENA took and passed the Supervising Deputy Sheriff Examination twice, and he is currently ranked twelfth (12th) on the Supervising Deputy Sheriff's promotional list.

57.  Despite LUCENA's high standing on the Supervising Deputy Sheriff's promotional list, along with his experience and impeccable disciplinary record, Defendants continue to pass over LUCENA for promotion, while promoting lower-ranked, inexperienced non-Hispanics, some of whom never even passed the Supervising Deputy Sheriff Examination.

58.  Defendants allege that they maintain a policy, practice and criteria that promotions are given based upon experience, seniority, evaluations, attendance and training.

16

59.   Defendants   repeatedly   and   continuously   violate this   policy,   practice   and   criteria   for   promotion   by promoting   non-Hispanics   over   Hispanic   Deputy   Sheriffs   who are more qualified and have more seniority.

60.   LUCENA,   along   with   other   Hispanics,   are   treated differently   than   similarly   situated   non-Hispanics   in   that Defendants   routinely   deny   the   transfer   requests   of Hispanics while consistently granting the transfer requests of non-Hispanics.

61.   In   February   2005,   Defendants   finally   granted Plaintiff   LUCENA   a   transfer   after   nearly   five   years   of persistent   applications   and   rejections.   Meanwhile, Plaintiff has observed the ease and effortlessness at which non-Hispanic   Deputies   are   granted   transfers   in   the Sheriff's Department.

62.   Throughout   the   many   years   that   LUCENA   was   a Deputy   Sheriff,   he   observed   non-Hispanic   deputies   being transferred to their desired unit upon request without any difficulties.

63.   On   June   7,   1999,   Plaintiff   LUCENA   formally requested   a   transfer   from   the   Warrant   Unit   to   the   Bronx Private   Sector.   Said   request   was   denied.   Instead,   in October 1999, LUCENA was transferred to a unit he had not

requested, the Sheriff's Auction Unit, which is considered to be an undesirable unit.

64. Plaintiff LUCENA continued to request transfers without any positive results, despite the fact that non-Hispanic deputies were being transferred upon their request.

65. On May 7, 2004, Plaintiff LUCENA again formally requested a transfer to the Bronx Private Sector. On May 13, 2004, LUCENA received a response once again denying his request for the following reason: "The operational needs of the office do not justify assigning additional deputy sheriffs to the Bronx Private Sector at this time." In clear contradiction to this statement, Defendants had in fact transferred a non-Hispanic Deputy Sheriff II by granting his request to be transferred to the Bronx Private Sector. Said request by the non-Hispanic deputy was honored within a few of weeks of submission, and was not even carried out in an official personnel order memorandum as is the custom, practice and regulation of the Sheriff's Office.

66. The transfer of non-Hispanics who do not even make official requests in the prescribed formal manner has become a standard practice in the Sheriff's Office. As

18

such, Plaintiff LUCENA and other Hispanics are treated differently than said similarly situated non-Hispanics.

67. On July 7, 2004, a personnel order was issued whereby five out of six deputies on said transfer order were non-Hispanic, despite the fact that numerous Hispanics requested to be transferred.

68. On August 9, 2004, another non-Hispanic Deputy Sheriff was transferred, who had submitted his application for transfer only days prior, while many Hispanic deputies, including Plaintiff LUCENA, who previously submitted their applications for transfer, were passed over for this non-Hispanic deputy.

69. As a result of the numerous complaints made by Plaintiff LUCENA and other Hispanic deputies regarding the prejudicial treatment by the Sheriff's Office and the discriminatory fashion in which promotions are made, on September 30, 2004, Defendant ODOM issued an email to all Deputies stating that all transfer requests must be submitted to an Undersheriff by October 8, 2004. Moreover, ODOM stated that consideration would be given based upon attendance, evaluations, training and background.

70. On October 4, 2004, Plaintiff LUCENA forwarded yet another transfer request to Undersheriff Talamo pursuant to the September 30th email of Defendant ODOM. In

19

retaliation for Plaintiff LUCENA's complaints of discrimination, Defendants misplaced his transfer request. As a result, Plaintiff was forced to prepare and forward an additional request to Defendant ODOM, causing further delay of his transfer request.

71. Despite numerous non-Hispanics being transferred immediately after the September 30th email of Defendant ODOM, Plaintiff LUCENA did not receive notification of his transfer until February 2005, well after the non-Hispanics were transferred, and approximately five years after his initial request was made.

72. Plaintiff LUCENA was forced to witness the transfer of non-Hispanic deputies, while he and other Hispanic deputies who were similarly situated were denied their requests, resulting in disparate treatment.

73. As a direct result of the severe and pervasive discrimination that Plaintiff LUCENA has endured, his earning potential has been severely limited.

74. As a result of the disparate treatment due to Plaintiffs' race and national origin, as well as retaliation for complaining of said discriminatory practices, Plaintiff LUCENA has been economically damaged and caused to endure indescribable amounts of undue stress and anxiety.

C.    **COMPLAINT OF DAVID PEREZ**

75.  Plaintiff PEREZ began his career with the CITY Sheriff's Office in December 1986 as a Deputy Sheriff.

76.  Plaintiff PEREZ is an FBI/NYS Certified Firearms Instructor, a NYS Certified Police Instructor and an Advanced Taser Instructor. PEREZ, throughout his many years of service, has been selected by various commanders within the Sheriff's Department to be a part of their units, including the Warrant Unit, the Kendra Unit and the Firearms and Tactics Unit.

77.  Plaintiff PEREZ is well regarded by his superiors and was always, and continues to be, a dutiful and loyal employee of the CITY Sheriff's Office.

78.  Despite Plaintiff PEREZ' above standard performance and seniority over non-Hispanic deputies, PEREZ has been, and continues to be, repeatedly passed over for promotion to Sergeant.

79.  Defendant CITY and the Department of Finance maintain a policy, practice and regulation that all Deputy Sheriffs are to be evaluated on an annual basis. Despite said policy, practice and regulation, Plaintiff PEREZ has not received a written performance evaluation in over six years, despite his numerous requests to his superiors.

21

Defendants have never given PEREZ an explanation for their failure to evaluate him.

80.   An evaluation is crucial for any Deputy Sheriff in order to receive a transfer and/or promotion, since it is one of the criteria cited by Defendant ODOM in his September 30th email stating the alleged standards used to evaluate an individual's transfer and promotion potential.

81.   Plaintiff PEREZ has been treated differently than similarly situated non-Hispanic deputies who receive written performance evaluations on a regular basis and upon request.

82.   Plaintiff PEREZ asserts that Defendants engaged, and continue to engage, in a pattern and practice of discrimination against Hispanics in that Hispanics are disproportionately promoted to the position of Sergeant.

83.   Similarly situated non-Hispanic Deputy Sheriffs with less seniority have received promotions ahead of Plaintiff PEREZ and other Hispanics with the same or better qualifications.   Said policy has a disparate impact on Hispanics.

84.   Upon information and belief, the only reason Plaintiff PEREZ did not receive a promotion was due to his race and national origin and in retaliation for expressing his complaints of disparate treatment to his superiors.

85. Further, as part of a pattern of discriminatory treatment of Hispanics, and specifically Plaintiff PEREZ, Defendants frequently give undesirable transfers and/or deny transfer requests to Hispanics while non-Hispanics receive transfers to a unit in which overtime is permitted.

86. Plaintiff obtained a line of duty injury on or about July 15, 2003. He returned to work in June 2005 at which time he was informed that he was being transferred out of the Kendra Unit to the Scofftow Unit for night tours.

87. Plaintiff informed Defendants that due to his military service commitments the transfer to the Scofftow Unit would be a tremendous detriment and hardship resulting in PEREZ exhausting his military days since military drills are held at night.

88. Defendants denied PEREZ' request despite the fact that there were other positions available in other units within the Sheriff's Office such as the Warrants Unit or the New York County Private Sector Unit.

89. Defendants have in the past and continue to the present day to accommodate non-Hispanics who have conflicts with their schedule, and transfer said non-Hispanics to a different unit that is more convenient.

23

90.   On or about November 2005, PEREZ submitted an application for approval to work outside of his employment as a Deputy Sheriff. Said application normally takes two weeks for approval from Defendants. PEREZ' application took two months before he received approval to work outside of his employment with the Sheriff's Unit. As a result of Defendant's delay, the job was no longer available to PEREZ.

91.   Defendants deliberate procrastination was in retaliation for PEREZ' formal complaint to the EEOC and his informal complaints logged to his superiors within the Department of Finance.

92.   As a direct result of the severe and pervasive discrimination that Plaintiff PEREZ has endured, his earning potential has been severely limited.

93.   As a result of the disparate treatment due to Plaintiffs' race and national origin, as well as retaliation for complaining of said discriminatory practices, Plaintiff PEREZ has been economically damaged and caused to endure indescribable amounts of undue stress and anxiety.

### D.    COMPLAINT OF LUIS FELICIANO

94.    Plaintiff FELICIANO began his career with the CITY Sheriff's Office in 1993 and he has held the rank of Lieutenant since 2001.

95.    At present time, Plaintiff FELICIANO is the only male Hispanic supervisor in the CITY Sheriff's Office.

96.    Throughout his employ with the CITY Sheriff's Office, Plaintiff FELICIANO has always maintained an exemplary performance record.

97.    From August 2001 to the present time, the City Sheriff's Office has repeatedly transferred Plaintiff FELICIANO without his approval and ahead of less senior non-Hispanic lieutenants, all because of FELICIANO's Hispanic background and in retaliation to his complaints regarding discrimination.

98.    Plaintiff FELICIANO, along with other Hispanics in the CITY Sheriff's Office, is treated differently than similarly situated non-Hispanics in the terms and conditions of his employment in that Defendants routinely involuntarily transfer FELICIANO based upon his Hispanic background, and in a disproportionate manner as compared to similarly situated non-Hispanic deputies.

99.  From August 2001 to the present time, Plaintiff FELICIANO was transferred to more units in the CITY Sheriff's Office than any other Supervising Deputy Sheriff.

100. Even when he was no longer the supervisor with the least seniority, FELICIANO was transferred before non-Hispanic supervisors with less seniority.

101. Plaintiff FELICIANO was never consulted, nor did he request or warrant said transfers.

102. The aforementioned involuntary transfers were made upon the orders of Defendants ODOM and LAROSE who do not treat non-Hispanic supervisors in this manner.

103. On August 9, 2001, Plaintiff FELICIANO was promoted "provisionally" to the rank of Supervising Deputy Sheriff. At the time of said promotion, FELICIANO became only the second Hispanic to ever hold this rank.

104.  Plaintiff FELICIANO made official inquiries as to the reason for his "provisional" status, but neither the CITY Department of Finance nor the Department of Citywide Services offered a reason.

105. Plaintiff  FELICIANO  was  promoted  only "provisionally" because of his Hispanic background.

106. While a Supervising Deputy Sheriff, Plaintiff FELICIANO was assigned to night tours in the Scofftow Unit,

a tour and unit that is considered the least desirable assignment for any Supervising Deputy Sheriff.

107. Upon information and belief, Plaintiff FELICIANO was assigned the least desirable tour and unit in the CITY Sheriff's Office because of his Hispanic background.

108. Unlike non-Hispanic deputies who are promoted to the Supervising Deputy Sheriff position, Plaintiff FELICIANO was never provided with any formal on the job training.

109. In January 2002, Plaintiff FELICIANO was transferred to the New York County Private Sector Unit.

110. On April 11, 2002, Plaintiff FELICIANO was transferred to the King's County Sheriff's Office. Because of his Hispanic background, Plaintiff FELICIANO became the Supervising Deputy Sheriff with the least supervisory experience, placed in charge of the most difficult private sector unit. Plaintiff FELICIANO was placed in a position for which he was not qualified, for the express purpose of being used as a "scapegoat" so that any problems that arose in this difficult sector could be easily attributable to him.

111. In King's County, Plaintiff FELICIANO's authority was constantly being undermined due to his Hispanic background.

112. When Plaintiff FELICIANO attempted to formalize disciplinary actions against two insubordinate non-Hispanic Deputy Sheriffs, *FELICIANO* was disciplined instead and was transferred.

113. On or about March 20, 2003, Plaintiff FELICIANO met with Defendant ODOM regarding his intention of formalizing disciplinary actions against two Deputy Sheriffs under his command for failure to advise and request permission of their supervisor to engage in activity outside normal Sheriff operation.

114. At said meeting, Defendant ODOM expressed his support to Plaintiff FELICIANO, yet soon thereafter, FELICIANO received a faxed copy of an email summarily transferring *him* from the King's County Private Sector to the Kendra Unit. No reason was given for this transfer.

115. Plaintiff FELICIANO was transferred based upon his Hispanic background.

116. In April 2003, notice was given for the vacant position of Chief of Operations, and in May 2003, Plaintiff FELICIANO submitted his resume for consideration directly to Defendant ODOM.

117. Because of his Hispanic background, Plaintiff FELICIANO was never granted an interview by ODOM, nor was he even considered for the open position despite having ten

28

years of experience as a deputy, three years of experience as a Supervising Deputy Sheriff, and the fact that FELICIANO is a licensed attorney.

118. The vacant Chief of Operations position was given to a non-Hispanic who had absolutely no supervisory experience whatsoever and never performed a day of Sheriff's work.

119. On July 20, 2004, Plaintiff FELICIANO was transferred to the New York County Private Sector Unit where he was a supervisor.

120. Immediately after assuming said position, Plaintiff FELICIANO's most experienced subordinates were transferred to different duties in other offices and were assigned to non-Hispanic supervisors.

121. Plaintiff FELICIANO was never consulted about said transfers, nor did he request them.

122. Because of his Hispanic background, the City Sheriff's Office replaced Plaintiff FELICIANO's most experienced personnel with subordinates that had little or no experience on the job and had to be trained, several of whom were on restricted duty and had histories of work-related problems.

29

123. Because of his Hispanic background, Plaintiff FELICIANO became the supervisor with the least experienced Deputy Sheriff staff.

124. Upon information and belief, said transfers of Plaintiff FELICIANO's most experienced personnel were made on the orders of Defendants ODOM and LAROSE who do not treat similarly situated non-Hispanics in this manner.

125. On or about November 2004, Plaintiff FELICIANO was notified that: (a) the Sergeant under his command was being transferred to another unit, and (b) that the unit he was supervising, the New York County Private Sector Unit, was being relocated to 66 John Street, New York, New York.

126. Unlike non-Hispanic supervisors in the Sheriff's Office, Plaintiff FELICIANO was never consulted regarding said transfer or said relocation.

127. Said transfer and relocation were made upon the orders of Defendants ODOM and LAROSE. The Sheriff's Office has a custom and practice of consulting superior officers regarding transfers and relocations. Unlike Plaintiff FELICIANO, similarly situated non-Hispanic supervisors are consulted on said occasions.

128. Also on or about November 2004, Plaintiff FELICIANO assigned a specific tour to a non-Hispanic Sergeant who was newly assigned to FELICIANO's command. The

Sergeant appealed FELICIANO's tour assignment to Defendant LAROSE.

129. As per Sheriff's Office custom and practice, tours are assigned at the discretion of the supervisor.

130. Defendant LAROSE undermined Plaintiff FELICIANO's authority by not only accommodating the non-Hispanic Sergeant's preferred tour, but also by changing Plaintiff *FELICIANO's* tour.

131. On January 7, 2005, Defendant LAROSE notified Plaintiff FELICIANO via email that effective January 10, 2005, all lieutenants in the Private Sector Units were required to work 9:00 am to 5:00 pm tours.

132. Plaintiff FELICIANO was the *only* private sector supervisor to receive said email. No non-Hispanic lieutenants received said directive.

133. Plaintiff FELICIANO has been treated differently than similarly situated non-Hispanic lieutenants, based upon his race and national origin in that non-Hispanic supervisors are not required to work the 9:00 am to 5:00 pm tour in the Private Sector units.

134. On or about October 2005, Plaintiff FELICIANO applied for an open position in the Bronx.

135. Plaintiff FELICIANO was denied said position, which was given to a non-Hispanic Deputy with less experience and seniority than FELICIANO.

136. As a direct result of the severe and pervasive discrimination that Plaintiff FELICIANO has endured, his earning potential has been severely limited.

137. As a result of the disparate treatment due to Plaintiffs' race and national origin, as well as retaliation for complaining of said discriminatory practices, Plaintiff FELICIANO has been economically damaged and caused to endure indescribable amounts of undue stress and anxiety.

### E.  COMPLAINT OF JEFF RIVERA

138. Plaintiff RIVERA began his career with the Sheriff's Office in 1990 and has always had an exemplary performance record.

139. Despite his seniority, the commendations of his supervisors and his stellar performance evaluations, Plaintiff RIVERA has never been considered for promotion by Defendants.

140. Defendants, at present time, continue to promote non-Hispanic deputies with less seniority than Plaintiff RIVERA, based upon Plaintiff's Hispanic background.

141. On November 30, 2004, Plaintiff RIVERA wrote to Defendant ODOM regarding his frustrations with a discriminatory promotion system that overlooks merit, hard work and dedication.

142. Plaintiff RIVERA received no response from Defendant ODOM.

143. In addition, Plaintiff RIVERA is treated differently than similarly situated non-Hispanic deputies, in that, to the present day, the Sheriff's Office continuously denies Plaintiff, and other Hispanic deputies, preferred time schedules and transfer requests.

144. In addition, non-Hispanic deputies continue to have the privilege of picking the borough in which they wish to work, an option which Defendants never give to similarly situated Hispanic deputies.

145. As a direct result of the severe and pervasive discrimination that Plaintiff RIVERA has endured, his earning potential has been severely limited.

146. As a result of the disparate treatment due to Plaintiffs' race and national origin, as well as retaliation for complaining of said discriminatory practices, Plaintiff RIVERA has been economically damaged and caused to endure indescribable amounts of undue stress and anxiety.

33

F.    **COMPLAINT OF ANTONIO NIEVES**

147. Plaintiff NIEVES commenced his employment with the NEW YORK CITY Sheriff's Office as a Deputy Sheriff on December 27, 1993.

148. In his tenure with Defendant CITY, Plaintiff NIEVES has been unilaterally transferred numerous times to the least desirable units in the Sheriff's Office, while other non-Hispanic deputies are assigned to the unit of their choice, primarily a unit which allows for overtime.

149. Throughout his tenure with the Sheriff's Office, Defendants have failed on numerous occasions to investigate or respond to Plaintiff NIEVES' grievances, while the grievances of non-Hispanics are attended to.

150. In July 2003, Plaintiff NIEVES informed Defendant ODOM that he was requesting a transfer into the New York Private Sector to fill an opening that was becoming available.

151. Plaintiff NIEVES informed Defendant ODOM that the reason he was requesting said transfer was because said unit provides deputies with first hand training and preparation in anticipation for the Lieutenant's Examination, and that a position in said unit greatly increases a deputy's knowledge, skill and ability to earn a promotion.

34

152. Defendant ODOM stated to Plaintiff NIEVES that said request would be considered.

153. Plaintiff NIEVES' transfer request was welcomed by the Lieutenant and the Undersheriff of the New York Private Sector, however Defendant ODOM denied NIEVES' request based upon his Hispanic background and gave the position to a non-Hispanic deputy.

154. As a result, Plaintiff NIEVES lost the opportunity to adequately prepare for the Lieutenant's Examination given in February 2004, and was thus not promoted.

155. On numerous occasions, Plaintiff NIEVES has complained about the discriminatory treatment of Hispanic Deputy Sheriffs in that even though the Sheriff's Office is comprised of thirty three percent Hispanics, deputies with Hispanic backgrounds are grossly underrepresented and discriminated against in the Department of Finance as said agency has no Hispanics on its management staff.

156. As a direct result of the severe and pervasive discrimination that Plaintiff NIEVES has endured, his earning potential has been severely limited.

157. As a result of the disparate treatment due to Plaintiffs' race and national origin, as well as retaliation for complaining of said discriminatory

35

practices, Plaintiff NIEVES has been economically damaged and caused to endure indescribable amounts of undue stress and anxiety.

### G.   COMPLAINT OF JOSEPH APARICIO

158. Plaintiff APAICIO is currently a Sergeant in the CITY's Department of Finance, where he has been employed in the Sheriff's Office since July 8, 1991.

159. Plaintiff APARICIO, like other Hispanic deputies, is routinely and continuously denied transfer requests and is forced to remain in undesirable units which do not allow for overtime. Meanwhile, the transfer requests of non-Hispanic deputies are consistently granted by Defendants.

160. On or about October 2004, Plaintiff APARICIO requested a transfer to an available position in the Bronx. Plaintiff APARICIO, because of his Hispanic background, was told that said position did not exist. Shortly thereafter, a non-Hispanic Sergeant was given the position.

161. On or about November 2004, a non-Hispanic Sergeant was transferred into the Warrants Unit over Plaintiff APARICIO who had more seniority and a longstanding interest in returning to the Warrants Unit where he had previously served and had an excellent performance record.

162. Between September 12, 2002 and February 10, 2003, Plaintiff APARICIO submitted at least six formal written requests as well as countless verbal requests for a transfer.

163. Deputy Sheriff's Association President James Smyth contacted both Defendants EASON and ODOM on two separate occasions on Plaintiff APARICIO's behalf. EASON and ODOM told Smyth "anything but this."

164. Plaintiff APARICIO's numerous and continuing requests were never granted by Defendants, and he was never received an explanation for the denial of each and every one of his requests.

165. Plaintiff APARICIO initiated EEO complaints and received word from Defendant ODOM that if he "laid low" for awhile, he would be "taken care of." Plaintiff APARICIO was never "taken care of."

166. Plaintiff APARICIO has, and continues to the present day, to request a change of shift from night tours to day tours.

167. Even in light of Plaintiff APARICIO's seniority, time in rank, and excellent performance record, as well as his legitimate childcare needs, Defendants refuse to grant him a tour change, even though non-Hispanic deputies

receive tour changes as well as preferred tour schedules upon request to Defendants.

168. On numerous occasions, Plaintiff APARICIO has complained about the discriminatory treatment of Hispanic deputies in that Defendants routinely use Hispanics for the purpose of being stopgaps or fillers, so that non-Hispanic deputies can receive special accommodations in their schedules.

169. As a result of said complaints, Plaintiff APARICIO has been the target of retaliation in that Defendants have denied, and continue to present day to deny, all of his requests for a tour change and/or a transfer.

170. As a direct result of the severe and pervasive discrimination that Plaintiff APARICIO has endured, his earning potential has been severely limited.

171. As a result of the disparate treatment due to Plaintiffs' race and national origin, as well as retaliation for complaining of said discriminatory practices, Plaintiff APARICIO has been economically damaged and caused to endure indescribable amounts of undue stress and anxiety.

### H.   COMPLAINT OF CARLOS VAZQUEZ

172. Plaintiff VAZQUEZ commenced his employment with the NEW YORK CITY Sheriff's Office as a Deputy Sheriff on or about December 1994.

173. After successful completion of the training academy, Plaintiff VAZQUEZ was first assigned to the Scofftow Unit, which is widely considered the least desirable unit within the Sheriff's Office.

174. Despite an unblemished record, unanimously positive evaluations, and even after receiving a Medal of Honor for his service with the Sheriff's Office, Plaintiff VAZQUEZ was repeatedly passed over for promotion to the position of Sergeant, while less-qualified, non-Hispanics with less seniority were promoted.

175. The Sheriff's Office promoted said non-Hispanics without following any uniform standards detailing the criteria used to determine which deputies should receive a promotion, but rather, solely upon the basis of race.

176. On or about April 2004, Plaintiff VAZQUEZ was on assignment to the Warrant Unit, which was moved to a new location, 3010 Star Avenue in Long Island City. Several non-Hispanic deputies were given "choice" desks with full cubicles and top drawers, thereby allowing for maximum space and storage. On or about February 14, 2005, Deputy

Sheriff Kenneth Spencer was transferred out of the Warrant Unit, at which time Plaintiff VAZQUEZ requested that he be assigned to the available desk with storage space. Despite the fact that Plaintiff VAZQUEZ was first to request the desk, and Lt. Thomas Doyle accepted said request, Undersheriff Linda Reynolds decided to place a fellow black female in the desk space. Said black female had less seniority than Plaintiff VAZQUEZ, and furthermore, she was only a "provisional" deputy with less time in the position and in the Warrant Unit.

177. On or about September 2005, while assigned to the 8:00 a.m. to 6:00 p.m. tour, Plaintiff VAZQUEZ's supervisors informed him that Defendant LAROSE was considering unilaterally transferring him to a later tour, 11:00 a.m. to 9:00 p.m.

178. Plaintiff VAZQUEZ informed his supervisors that he had not requested said tour change, and that a tour change would present him with considerable hardship since he has an elderly mother who he cares for, he would have to discontinue taking educational night courses, and he would have to resign from his part time job where he has been working since 1997.

179. Furthermore, there was the same black, female "provisional" deputy who had been given the preferred desk

40

space, who had no civil service status, with less time in the Warrant Unit and less seniority than Plaintiff VAZQUEZ, who was *not* being considered for transfer to the late tour.

180. On or about September 20, 2005, Plaintiff VAZQUEZ filed a union grievance relating to the aforementioned circumstances. Plaintiff also wrote to Chief of Operations, DEFENDANT LAROSE, explaining that he had more time in job title than any other permanent or provisional deputy assigned to the Warrant Unit.

181. Despite his substantiated objections, Plaintiff VAZQUEZ was told that he had no choice but to accept a transfer to the late tour.

182. Upon being transferred to the late tour, Plaintiff VAZQUEZ was forced to discontinue taking night classes and cease furthering his education, he had no other choice but to seek aid in caring for his mother, and he had to quit his part time job which he had been working seven (7) days a week and which he relied upon as a needed source of income.

183. On or about October 14, 2005, during the course of his duties, Plaintiff VAZQUEZ slipped down a flight of stairs and fractured his elbow.

41

184. Said fracture prevented Plaintiff VAZQUEZ from returning to work for three (3) months while he underwent physical therapy four (4) times a week.

185. Upon his return to work, on or about February 2006, Chief Thalasitis told Plaintiff VAZQUEZ that management was angry with him and felt he had purposely injured himself, despite concrete medical proof that he did in fact fracture his elbow. At this time, Plaintiff VAZQUEZ was told that he would never work the day shift again. Upon information and belief, similarly situated non-Hispanics are not treated in this manner.

186. Plaintiff VAZQUEZ, upon returning to work after time off as a result of his injury, was denied a "light duty" assignment. Similarly situated non-Hispanic deputies, upon returning to work after sustaining an injury, are routinely given "light duty" work so as to aid in the recovery process. Plaintiff VAZQUEZ and other Hispanics in the Sheriff's Office are denied such accommodations that are routinely given to non-Hispanics, and are therefore treated differently on account of their race.

187. On or about May 1, 2006, Plaintiff VAZQUEZ, despite his substantiated objections and legitimate concerns, was assigned an even later tour, 1 p.m. to 11:00 p.m.

42

188. Plaintiff VAZQUEZ submitted numerous memos, as well as made telephonic requests to Chief Thalasitis, stating that in light of the aforestated circumstances, he desperately needed to work an earlier shift.

189. Plaintiff VAZQUEZ reiterated that there were provisional deputies with less seniority and less time in the Warrant Unit that were not being given late tours. It must be noted that said provisional deputies were non-Hispanic.

190. Lt. Shor responded to Plaintiff VAZQUEZ's memo by submitting an email to management that he had no problem with Plaintiff VAZQUEZ working an earlier shift. Yet management, as before, refused to allow Plaintiff VAZQUEZ to work the day shift, thereby giving the preferred tours to non-Hispanic deputies with less seniority.

191. Despite his seniority, time in unit, civil service status, legitimate family needs, and the loss of his second job, Plaintiff VAZQUEZ has been forced to continue to work the late tour over non-Hispanics who have less seniority, less time in unit, and who hold provisional, not civil service, status.

## AS AND FOR A FIRST CLAIM PURSUANT TO 42 USC §1981
## AGAINST ALL DEFENDANTS

192. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1-191 with the same force and effect as if fully set forth herein.

193. Throughout the events cited herein, the individual Defendants, while acting under the color of law, subjected Plaintiffs to the deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States, and specifically the equal protection and due process guarantees of the 14th Amendment of the Constitution, civil rights as guaranteed under Article I, Section II, of the New York State Constitution.

194. Plaintiffs have been deprived of their Constitutional rights to be free of discrimination based upon race, national origin and gender and have been damaged in their employment and have suffered emotional distress and conscious pain and suffering as a result of these actions.

195. The actions of Defendants, in depriving Plaintiffs of their constitutional and civil rights, as herein before stated, were willful and malicious acts.

44

196. As a result of the aforesaid wrongful, reckless and intentional acts of Defendants, Plaintiffs have been damaged in the amount of $5,000,000.00.

197. Based on the foregoing, Plaintiffs are entitled to punitive and exemplary damages in the sum of $5,000,000.00.

## AS AND FOR A SECOND CLAIM PURSUANT TO 42 USC §1983 AGAINST ALL INDIVIDUAL DEFENDANTS

198. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1-197 with the same force and effect as is fully set forth herein.

199. The individual Defendants have embarked on a course of conduct that deprived Plaintiffs of their rights under the United States Constitution, federal and state law.

200. The facts and circumstances cited above with reference to the Constitution and other civil rights violations suffered by Plaintiffs are examples of Defendants' violations of Plaintiffs' civil rights.

201. The actions of Defendants, acting under color of state and local law, custom and usage, have deprived Plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United States, and in

45

particular, of their rights to due process under the 14th Amendment.

202. By these actions, Defendants have jointly and separately deprived Plaintiffs of their rights under the 14th Amendment to the United States Constitution, in violation of 42 USC §1983.

203. As a consequence of Defendants' unlawful actions, Plaintiffs demand damages in the amount of $5,000,000.00.

## AS AND FOR A THIRD CLAIM AGAINST DEFENDANTS FOR FIRST AMENDMENT RETALIATION

204. Plaintiffs repeat, reallege, and reiterate each and every allegation set forth in paragraphs 1-203 with the same force and effect as is fully set forth herein.

205. Plaintiffs have been unlawfully subjected to a hostile work environment and harassment in retaliation for exercising their First Amendment rights to free speech.

206. The aforementioned conduct on the part of Defendants was without cause or justification and violated Plaintiffs' rights, civil rights, privileges and immunities as guaranteed by the First Amendment of the United States Constitution as well as the Constitution of the State of New York and the New York City Administrative Code and Human Rights Law.

207. The actions of Defendants in depriving Plaintiffs of their constitutional and civil rights were willful and malicious acts.

208. As a direct and proximate consequence of Defendants' unlawful, discriminatory and harassing conduct, Plaintiffs have suffered losses of benefits and privileges of their employment with the Sheriff's Office, been damaged professionally and economically, as well as suffered physical and emotional pain and suffering.

209. Based on the foregoing, Plaintiffs are entitled to compensatory damages in the amount of $5,000,000.00, and punitive and exemplary damages in the amount of $5,000,000.

## AS AND FOR A FOURTH CLAIM PURSUANT TO 42 USC §1985

210. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraph 1-209 with the same force and effect as is fully set forth herein.

211. Defendants have conspired with and amongst each other to deprive Plaintiffs of their rights under the United States Constitution, federal, state and city laws.

212. The named Defendants have conspired to violate Plaintiffs' civil rights pursuant to 42 USC § 1985 when they agreed together to implement, direct and/or

participate in a program to retaliate, harass and create a hostile work environment against Plaintiffs solely because of their race and national origin and in opposition to discrimination and whistle blowing.

213. Such policy and practice is an intentional and concerted effort by Defendants to disparage Plaintiffs.

214. By reason of the aforementioned facts and conspiracy, each of the individual Defendants has violated 42 USC § 1985.

215. The actions and omissions of Defendants, in depriving Plaintiffs of their constitutional and civil rights, by their participation in the discriminatory and harassing and retaliatory conduct, as herein stated, were willful and malicious acts.

216. Because of the foregoing, Plaintiffs have been damaged in the amount of $5,000,000.00, and punitive and exemplary damages in the sum of $5,000,000.00.

## AS AND FOR A FIFTH CLAIM IN VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT OF 1964 AS AMENDED

217. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1-216 with the same force and effect as is fully set forth herein.

218. Based upon the aforementioned facts, Defendants discriminated against Plaintiffs as a result of their race and national origin and in retaliation for exercising their First Amendment rights.

219. Defendants intentionally and willfully discriminated against and harassed Plaintiffs and permitted Plaintiffs to be discriminated against and harassed in their employment on account of their race and national origin and in retaliation for opposition to discrimination, thereby violating §704(A) OF Title VII of the Civil Rights Act of 1964 as amended and 42 USC §2000e-3(a).

220. No action was taken by Defendants or its agents to stop the harassment of Plaintiffs, thereby contributing to a hostile working environment.

221. As a result of the Defendants' conduct, Plaintiffs have suffered economic loss, pain, humiliation, embarrassment, extreme emotional distress and continue to suffer to this day, and further as a result of Defendants' conduct, Plaintiffs have suffered both professionally and personally.

222. As a result of the foregoing, Plaintiffs have been damaged in the amount of $5,000,000.00. Additionally, Plaintiffs seek punitive and exemplary damages in the sum of $5,000,000.00 against the individual Defendants.

## AS AND FOR A SIXTH CLAIM PURSUANT TO NEW YORK STATE EXECUTIVE LAW §296

223. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1-222 with the same force and effect as if fully set forth herein.

224. Based on the foregoing, Defendants intentionally and willfully discriminated against Plaintiffs in their employment on account of race and national origin and in opposition to discriminatory practices in violation of New York State Executive Law §296. Plaintiffs have continuously been victimized by Defendants for their opposition to discrimination and a hostile working environment created by Defendants.

225. Even though Defendants were aware of Plaintiffs' complaints and the existence of a hostile work environment, no actions were taken by Defendants in an effort to correct the discriminatory conduct on behalf of the individual Defendants.

226. Such conduct on the part of Defendants and all others, without cause or justification, violated the Plaintiffs' civil rights guaranteed under the New York State Constitution and New York State Executive Law § 296.

227. As a result of Defendants' actions and all deprivations of Plaintiffs' rights as guaranteed under New York State Executive Law § 296, Plaintiffs have suffered economic loss, pain, humiliation and extreme emotional distress.

228. As a result of the foregoing wrongful, careless and intentional acts of Defendants, Plaintiffs have been damaged in the amount of $5,000,000.00. Additionally Plaintiffs seek punitive and exemplary damages in the amount of $5,000,000.00.

## AS AND FOR A SEVENTH CLAIM PURSUANT TO NEW YORK CITY ADMINISTRATIVE CODE SECTION 8-107(1) et. seq.

229. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1-228 with the same force and effect as is fully set forth herein.

230. Defendants discriminatory conduct based on Plaintiffs' race and national origin, as well as in retaliation for their whistle blowing and complaints of discriminatory conduct by other members of the Department of Finance and in retaliation for their opposition to discrimination, constitutes discrimination in violation of the New York City Administrative Code § 8-107(1) et.seq. and the New York City Human Rights Law.

231.  The aforementioned occurrences were caused by the wrongful, careless, reckless and intentional acts of Defendants.

232.  Because of the foregoing, Plaintiffs have been damaged in the amount of $5,000,000.00.  Additionally Plaintiffs seek punitive and exemplary damages in the amount of $5,000,000.00.

## JURY TRIAL

233.  Plaintiffs request a jury trial on all questions of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this honorable Court grant the following relief:

1.  Declare that the aforementioned actions of Defendants were unconstitutional and in violation of the United States Constitution, the New York State Constitution and New York City Human Rights Law and Administrative Code along with all applicable statutes;

2.  Declare that the aforementioned discriminatory actions of Defendants were in violation of New York State Executive Law § 296, 42 U.S.C. § 1981, 42 U.S.C. § 1983, 42 U.S.C. § 1985, and Title VII of the Civil Rights Act of 1964, as amended;

3.   As   and   for   Plaintiffs'   First   Claim,   grant Plaintiffs  the  sum  of  $5,000,000.00,  along  with  punitive and exemplary damages in the amount of $5,000,000.00;

4.   As   and   for   Plaintiffs'   Second   Claim,   grant Plaintiffs the sum of $5,000,000.00 along with punitive and exemplary damages in the amount of $5,000,000.00;

5.   As   and   for   Plaintiffs'   Third   Claim,   grant Plaintiffs the sum of $5,000,000.00 along with punitive and exemplary damages in the amount of $5,000,000.00;

6.   As   and   for   Plaintiffs'   Fourth   Claim,   grant Plaintiffs the sum of $5,000,000.00 along with punitive and exemplary damages in the amount of $5,000,000.00;

7.   As   and   for   Plaintiffs'   Fifth   Claim,   grant Plaintiffs the sum of $5,000,000.00 along with punitive and exemplary damages in the amount of $5,000,000.00;

8.   As   and   for   Plaintiffs'   Sixth   Claim,   grant Plaintiffs the sum of $5,000,000.00 along with punitive and exemplary damages in the amount of $5,000,000.00;

9.   As   and   for   Plaintiffs'   Seventh   Claim,   grant Plaintiffs the sum of $5,000,000.00 along with punitive and exemplary damages in the amount of $5,000,000.00;

10.  Grant  Plaintiffs  all  costs  for  this  action, including reasonable attorney's fees; and

11.   Grant Plaintiffs such other and further relief as
this Court may seem just and proper.

Dated:    Lake Success, New York
          June 27, 2006

                              Yours etc,
                              Cronin & Byczek, LLP

                              _Christopher F. Bellistri_
                              Christopher F. Bellistri (CB4387)
                              Attorneys for Plaintiffs
                              1981 Marcus Ave, Suite 227
                              Lake Success, New York 11042
                              (516) 358-1700